# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EXELON GENERATION COMPANY, LLC, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 15 C 309 |
| LOCAL 15, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, | ) ) ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Local 15, International Brotherhood of Electrical Workers, AFL-CIO, filed grievances against Exelon Generation Company, LLC on behalf of six employees for imposing upon them a requirement of complete abstinence from alcohol. Exelon imposed this requirement upon each of the employees pursuant to the recommendations of its Substance Abuse Expert in her role within its Fitness For Duty program, which is mandated by Nuclear Regulatory Commision (NRC) regulations.

Exelon has filed suit against Local 15 seeking a declaratory judgment that the union cannot challenge fitness-for-duty determinations by filing grievances or seeking arbitration under the dispute resolution procedure established by the parties' collective bargaining agreement (CBA). Local 15 responds that the CBA requires arbitration of the dispute and that any disagreement about the dispute's arbitrability must itself be arbitrated. Both parties have moved for summary judgment. For the reasons stated

below, the Court grants Local 15's motion and denies Exelon's motion.[1]

**Background**

Exelon is in the business of power generation and supply. It owns and operates nuclear power plants in Illinois, Pennsylvania, and New Jersey. It is licensed to conduct nuclear power generation by the NRC and is subject to the agency's regulations. One such set of regulations requires all commercial nuclear power plant licensees to maintain an approved Fitness For Duty (FFD) program. This program must "provide reasonable assurance that individuals are trustworthy and reliable as demonstrated by the avoidance of substance abuse." 10 C.F.R. § 26.23(a). It must also "provide reasonable assurance that individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties." *Id.* § 26.23(b).

Like other nuclear power plant operators, Exelon requires employees working in its nuclear power generating facilities to acquire unescorted access authorization as a condition of their employment. NRC regulations require that when there are indications that an individual with unescorted access "may be in violation of the licensee's or other entity's FFD policy or is otherwise unable to safely and competently perform his or her duties," that individual must undergo an evaluation called a "determination of fitness." *Id.* § 26.189(a). This determination of fitness must be carried out by a qualified Substance Abuse Expert (SAE) when an employee's violation of the FFD program

---

[1] Local 15 also moved, pursuant to Federal Rule of Civil Procedure 56(d), for discovery to respond to Exelon's motion for summary judgment. Because the Court grants Local 15's motion for summary judgment, it need not decide Local 15's discovery motion.

2

involves substance abuse. *Id.* §§ 26.187, 26.189(a)(1). NRC regulations provide that a qualified SAE "shall evaluate individuals who have violated the substance abuse provisions of an FFD policy and make recommendations concerning education, treatment, return to duty, followup drug and alcohol testing, and aftercare." *Id.* § 26.187(g). An SAE has the obligation "to protect public health and safety and the common defense and security by professionally evaluating the individual and recommending appropriate education/treatment, follow-up tests, and aftercare." *Id.* In order to "ensure consistency and continuity in the treatment of an individual who may be undergoing treatment, aftercare, and followup testing," 70 Fed. Reg. No. 165, 50442, 50575 (Aug. 25, 2005), NRC regulations strictly limit who may review or revise an SAE's evaluation:

> Neither the individual nor licensees and other entities may seek a second determination of fitness if a determination of fitness under this part has already been performed by a qualified professional employed by or under contract to the licensee or other entity. After the initial determination of fitness has been made, the professional may modify his or her evaluation and recommendations based on new or additional information from other sources including, but not limited to, the subject individual, another licensee or entity, or staff of an education or treatment program. Unless the professional who made the initial determination of fitness is no longer employed by or under contract to the licensee or other entity, only that professional is authorized to modify the evaluation and recommendations.

10 C.F.R. § 26.189(d).

Exelon is required to submit to NRC audit at least once every twenty-four months. The NRC last audited Exelon's FFD program in October 2014 and approved it as compliant with the agency's regulations. Among other things, NRC inspectors verified that Exelon's SAE was qualified and that the company's FFD program met the requirements of 10 C.F.R. § 26.

3

Pursuant to its approved program, Exelon contracts with Triangle Occupational Medicine and its president, Dr. Barbara Pohlman, to provide medical review officer services. Dr. Pohlman is a licensed physician with knowledge of substance abuse disorders and training in substance abuse treatment. Although she serves as Exelon's Medical Review Officer and SAE, Dr. Pohlman and her staff often receive treatment recommendations from staff members of Optum Health, which administers Exelon's employee assistance program. Exelon's written FFD policy provides that Optum staff may be called upon to collect specimens for drug and alcohol testing, perform behavioral observation, and provide input for determinations of fitness. Optum staff is responsible for providing confidential assessment, short-term counseling, referral services, and treatment monitoring for FFD related issues.

After conducting an assessment, Optum submits a report to Dr. Pohlman. Optum's reports are modeled on sample reports that Optum provides to its staff, which instruct evaluators to communicate the issue or problem the employee presents and the employee's history of substance use. Optum representatives are instructed to provide a treatment recommendation, a diagnosis and prognosis, and a return-to-work recommendation. The sample reports also ask the Optum representative to provide a "professional determination that the employee is/is not 'trustworthy and reliable' to perform duties and be considered to maintain nuclear access to protected areas" and to make a "clinical recommendation regarding whether or not the employee should maintain a lifetime of abstinence from alcohol and/or addictive substances." The sample form further instructs the Optum representative: "Please use the following wording: 'Due to the client's history and clinical presentation, complete abstinence from

the use of alcohol and/or any other intoxicating substances at all times and under all circumstances, including during working hours and non-working hours, weekends, and holidays, is recommended.'" Dr. Pohlman makes fitness determinations in light of the recommendations she receives from Optum staff.

In 2012 and 2013, numerous Exelon employees were evaluated by Optum staff, who submitted their findings and recommendations to Dr. Pohlman. Dr. Pohlman reviewed and adopted those findings and recommendations in the course of making determinations of fitness for those employees. The employees then received letters from Susan Techau, Exelon's Access Authorization Fitness for Duty Program Manager. The letters informed the employees that they were each required to totally abstain from alcohol as a condition of continued unescorted access to Exelon's nuclear power plants.

Local 15 is a labor union that represents approximately 1,600 hourly employees at Exelon's nuclear generating facilities in Illinois. Exelon and Local 15 are parties to a collective bargaining agreement, and they have engaged in collective bargaining for more than fifty years. The CBA contains an arbitration clause. Article VIII, paragraph 5, of the CBA provides:

> Should any dispute or difference arise between the Company and the Union or its members as to the interpretation or application of any of the provisions of this Agreement or with respect to job working conditions, the term working conditions being limited to those elements concerned with the hours when an employee is at work and the acts required of the employee during such hours, the dispute or difference shall be settled through the grievance procedure.
>
> It is the intent of the Company, Local Union 15, and the employees that timely filed grievances shall be settled promptly. A grievance is timely filed when submitted at Step 1 of this grievance process by the appropriate Local Union 15 representative in writing on the form adopted for such purpose to an appropriate management representative of the Company no later than thirty (30) calendar days after the date of the

action complained of, or the date the employee became aware or reasonably should have become aware of the incident which is the basis for the grievance, whichever is later.

A dispute as to whether a particular disagreement is a proper subject for the grievance procedure shall itself be treated as a grievance.

Exelon Ex. E, Dkt. No. 25-1, at 104–05.

Between May 2012 and August 2013, Local 15 filed grievances against Exelon on behalf of six separate employees who received complete abstinence letters. The grievances stated:[2]

**May 1, 2012 Grievance:** "The Company has placed a permanent abstinence alcohol requirement/expectation on [the grieving employee] in order to maintain his Nuclear access. 'This requirement/expectation is not required by any standard and affects his ability to participate in legal off site activities.'" *Id.*, Ex. D at 95.

**July 3, 2012 Grievance:** "The Company has placed a permanent alcohol requirement on [the grieving employee] in order to obtain and maintain his access to Exelon nuclear facilities. This requirement is not required by any standard and affects [the grieving employee's] ability to participate in legal off-site activities." *Id.* at 96.

**September 25, 2012 Grievance:** "[The grieving employee] received an unjust 'Complete Abstinence Letter' from Access Authorization Fitness for Duty Program Manager-Susan Techau and Exelon's MRO in order to maintain unescorted access to Exelon Nuclear Generating Stations." *Id.* at 97.

**April 30, 2013 Grievance:** "[The grieving employee] has received an abstinence letter concerning alcohol consumption that restricts his ability to conduct legal activities

---

[2] Information identifying the employees has been redacted from the records presented to the Court.

while off of Company time." *Id.* at 98.

**May 28, 2013 Grievance:** "On April 30, 2013, [the grieving employee] was informed through certified mail that he has to abstain from alcohol consumption and intoxicating substances during non work hours, work hours, holidays and weekends. This condition must be maintained to be employed with Exelon. Local 15 feels this is excessive and needs to be removed from his file." *Id.* at 99.

**August 6, 2013 Grievance:** "[The grieving employee] has received an unjust 'Complete Abstinence Letter' from Access Authorization fitness for duty Manager Susan Techau and Exelon MRO in order to maintain unescorted access to Exelon Nuclear Generating Station's [sic]. The Union Demands [sic] this requirement/letter be removed from [the grieving employee's] record." *Id.* at 100.

One of the grievances proceeded through to arbitration, which was set for early February 2015. Exelon objected to the filing of the grievances and refused to participate in the arbitration. It filed suit in this Court seeking a declaratory judgment, and the arbitrator stayed arbitration proceedings pending resolution of this lawsuit.

In its complaint, Exelon asserts that NRC regulations forbid anyone other than the SAE from rescinding the recommendations made in a determination of fitness and that Local 15's grievances necessarily would require an arbitrator to do just that. Exelon seeks a declaration that (1) only a court may determine whether NRC regulations preclude arbitration of FFD disputes like the ones presented in the grievances; (2) only the SAE may make determinations of fitness pursuant to NRC regulations; and (3) determinations of fitness made by the SAE are not subject to the CBA's grievance procedure.

7

Local 15 responds by claiming that pursuant to the parties' CBA, the issue of whether Exelon had just cause to impose a total abstinence requirement is a question for an arbitrator to resolve, and in any event, the CBA provides that arbitrability of such a dispute is itself a question for arbitral resolution. Local 15 also argues that Exelon's suit is not ripe for judicial determination because it is not clear that an arbitrator's decision would conflict with federal regulations. Local 15 has also counterclaimed, seeking an order compelling arbitration pursuant to the CBA. Both parties have now moved for summary judgment.

## Discussion

A party is entitled to summary judgment if it shows that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. On cross-motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). "As with any summary judgment motion, [the Court] review[s] cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

### A. Who determines arbitrability

As a general rule, determination of whether parties to a CBA have agreed to submit a dispute to arbitration is a task reserved to the courts. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 208 (1991). This default rule can be avoided, however, if the parties contract to assign determination of the arbitrability of a dispute to an arbitrator. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Air Line Pilots Ass'n, Int'l v. Midwest Express Airlines, Inc.*, 279 F.3d 553, 555 (7th Cir. 2002). To assign questions of arbitrability to an arbitrator, "parties must evidence in their agreement a clear and unmistakable intent to cede the arbitrability question to the arbitrator." *Air Line Pilots Ass'n*, 279 F.3d at 559 (Ripple, J., concurring in part and dissenting in part) (citing *Kaplan*, 514 U.S. at 944). Even then, it is a court's duty to determine whether the question of arbitrability has been assigned to an arbitrator. *Kaplan*, 514 U.S. at 944.

Local 15 contends that the parties contracted to submit all arbitrability questions to arbitration. It cites language in the CBA stating that "[a] dispute as to whether a particular disagreement is a proper subject for the grievance procedure shall itself be treated as a grievance" as clear and unmistakable evidence that the parties intended for an arbitrator to determine all disputes as to whether a disagreement is arbitrable.

Exelon advances three arguments against submitting arbitrability to an arbitrator for resolution. First, it attempts to reframe the issue as a dispute not about work conditions, but rather about whether federal law preempts the parties' CBA. Exelon's argument is essentially that a "dispute" in the arbitrability clause refers to a disagreement over whether a challenge to work conditions has been properly brought or

involves the kind of work conditions the CBA has in mind, not a disagreement over whether federal law permits arbitration. Second (and relatedly), Exelon argues that the CBA by its terms forbids an arbitrator from settling disputes about arbitrability arising out of conflicts with federal law. Exelon bases this contention on a portion of the CBA stating that "[a]ll decisions rendered by the impartial arbitrator shall be final and binding upon both parties. The impartial arbitrator shall be governed wholly by the terms of this agreement and shall have no power to add to or change its terms." Exelon Ex. E, dkt. no. 25-1, at 108. Exelon says that under this provision, an arbitrator has no ability to examine or consider external law and thus cannot make an arbitrability determination that requires consideration of NRC regulations. Third, Exelon argues that even if the CBA submits the question of arbitrability to the grievance process, past dealings between Local 15 and Exelon make it apparent that a court, not an arbitrator, is to decide issues of arbitrability. Specifically, Exelon says that in three earlier cases, Local 15 either did not argue that an arbitrator must decide arbitrability or stipulated that the question was one for the courts to decide.

This last point is problematic, for two reasons. Exelon contends that through three earlier cases in this district, the parties have established a practice of submitting the question of arbitrability to the court. Not so. It is true that in one of the cases, the district judge noted that "the parties have stipulated that these two issues require judicial resolution by declaratory judgment." *Exelon Gen. Co. v. Local 15, Int'l Bhd. of Elec. Workers, AFL–CIO*, No. 10 C 4846, 2011 WL 2149624, at *2 (N.D. Ill. May 25, 2011) ("*Exelon 2*"), *rev'd on other grounds*, 676 F.3d 566 (7th Cir. 2012) ("*Exelon 3*"). In another, however, Local 15 argued that under the CBA, the issue of arbitrability should

10

be determined by an arbitrator. *See Exelon Gen. Co. v. Local 15, Int'l Bhd. of Elec. Workers, AFL–CIO*, No. 06 C 6961, 2008 WL 4442608, at *8 n.3 (N.D. Ill. Sept. 29, 2008) ("*Exelon 1*"). And in the third case, the issue does not appear to have been raised. *Exelon Gen. Co. v. Local 15, Int'l Bhd. of Elec. Workers, AFL–CIO*, No. 07 C 968, 2007 WL 4526595 (N.D. Ill. Dec. 3, 2007) ("*Exelon 4*"). In short, there is no pattern of the sort that Exelon suggests. And in any event, even if there were the kind of pattern Exelon alleges, it would not matter. Exelon cites no authority, and the Court is aware of none, indicating that failure to make an argument in a past suit amounts to forfeiture of the same argument in a later suit or a tacit agreement that the other side's position in the earlier suit will govern later suits.

Standing alone, the arbitrability provision in the CBA seems to evince "clear and unmistakable" intent to submit all disputes about arbitrability to an arbitrator, even where external law motivates Exelon's actions. Local 15 correctly argues that Exelon's reliance on *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70 (1998), is misguided. *Wright* stands merely for the proposition that without a clear and unequivocal waiver, a union-negotiated CBA may not waive employees' statutory right to a judicial forum for discrimination claims. Local 15 is also right that courts have held determination of arbitrability to be sufficiently conferred upon the arbitrator in CBAs containing provisions similar to the one in the Exelon-Local 15 CBA. *See, e.g.*, *Air Line Pilots Ass'n*, 279 F.3d at 559 (Ripple, J., concurring).

But the arbitrability provision does not stand alone. Instead, it must be read together with the CBA's limitation on an arbitrator's adjudicative capacity, which states that the arbitrator is entirely governed by the terms of the CBA. And although arbitrating

11

the dispute between Local 15 and Exelon may not require an arbitrator to consider federal law, determining whether arbitration is proper will.  This case presents the question whether attempting to arbitrate the propriety of Exelon's implementation of its SAE's recommendation is tantamount to seeking a second determination of fitness in violation of federal law.  There does not appear to be any way for an arbitrator to determine whether a grievance is a "second determination of fitness" without examining federal regulations for a definition of that term.

The standard for demonstrating that determination of arbitrability has been assigned to an arbitrator is strict.  See *Miller v. Flume*, 139 F.3d 1130, 1133–34 (7th Cir. 1998).  In light of the limitations the CBA places on arbitrators, the Court is not prepared to say that the CBA clearly and unmistakably grants an arbitrator the authority to determine whether this particular dispute is arbitrable.  Because the presumption in favor of judicial determination of arbitrability has not been rebutted, the Court will determine arbitrability.

**B.     Whether the grievances are arbitrable**

As an initial matter, if pursuing a grievance challenging SAE-mandated abstinence requirements is tantamount to "seek[ing] a second determination of fitness," NRC regulations forbid arbitration.  10 C.F.R. § 26.189.  Local 15's position on this has drifted somewhat over the course of briefing.  At times, Local 15 has appeared to suggest that it seeks to have an arbitrator review the evidence submitted to the SAE to determine whether her recommendation was a good one, or to determine whether her process was compliant with NRC regulations.  This would be impermissible, because pursuing a grievance to mount such challenges amounts to seeking a second

12

determination of fitness from someone other than the authorized SAE, which 10 C.F.R. § 26.189 does not permit. Despite this occasional drift, however, Local 15 has consistently repeated (in every filing) that it seeks through its grievances to arbitrate whether Exelon had just cause to impose new conditions on an employee's unescorted access to its nuclear power plants. And Local 15 has consistently argued that this does not amount to a request for redetermination of the employee's fitness. Exelon urges that this is a mere semantics game, but it is not: asking an arbitrator to determine whether Exelon had just cause to place conditions on continued unescorted access simply is not the same thing as asking an arbitrator to determine whether the employee is fit for duty or should have received a different treatment recommendation from the SAE.

The grieved dispute therefore concerns whether, when it adopts and implements the recommendation an SAE gives in its determination of fitness, Exelon has just cause to impose new conditions on unescorted access. To determine whether Exelon and Local 15 have committed this dispute to arbitration, the Court must look to whether the dispute is, "on its face," governed by the CBA's arbitration provision. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas Corp.*, 531 F.3d 531, 535 (7th Cir. 2008). The Supreme Court has made clear that law and public policy strongly favor arbitration and that the party seeking it is entitled to the benefit of the doubt. *Int'l Bhd. of Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014) (citing *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 378–79 (1974)). Where an arbitration clause is broad, disputes are presumed arbitrable. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475

U.S. 643, 649 (1986). The Court will compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steel*, 531 F.3d at 535 (quoting *United Steelworkers of Am. v. Warrior & Gulf*, 363 U.S. 574, 582–83 (1960)).

As other courts have previously pointed out, the arbitration clause contained in the CBA between Local 15 and Exelon is considerably broad. In *Exelon 1*, an employee's unescorted access was revoked pursuant to the company's NRC-mandated access authorization program. The employee filed a grievance seeking review of whether revocation of his unauthorized access was supported by just cause. Exelon sought a declaratory judgment from a federal court stating that the issue was not arbitrable because Exelon's revocation decision was made as a result of mandatory requirements imposed under NRC regulation. The court observed that within 10 C.F.R. § 73 (the NRC regulations that require employees to satisfy certain access authorization standards in order to retain their unescorted access) there exists a provision which indicates that companies should provide a review process by which employees who lose their unescorted access may challenge revocation. The court held that the regulatory history and text did not indicate any intention to abdicate—and, indeed, suggested that the NRC in fact supported—the longstanding industry practice of arbitrating challenges to unescorted access revocations, even where such revocations were mandated under federal regulation. *See Exelon 1*, 2008 WL 4442608, at *3–5.

In *Exelon 3*, the Seventh Circuit examined whether the 2009 amendments to the NRC regulations implicitly terminated this longstanding tradition. The case arose under similar circumstances as those present in *Exelon 1*: Exelon revoked an employee's

14

unescorted access pursuant to mandatory NRC rules under 10 C.F.R. § 73 when the employee failed to satisfy requirements under the company's access authorization program, and the employee filed a grievance claiming the revocation was not supported by just cause. The Seventh Circuit held that if the NRC had intended to do away with the longstanding and notorious practice of committing to arbitration disputes about unauthorized access revocation, it would have done so expressly. Because it did not, arbitration was still an acceptable method for an employee to challenge the revocation of his unescorted access. *See Exelon 3*, 676 F.3d at 573–75.

To be sure, the circumstances in these cases were different from those in the present case. Exelon first attempts to distinguish them by pointing out that in both of these prior cases, Local 15 brought grievances on behalf of employees challenging actual revocations of their unrestricted access, long understood to be the type of employment action that employees challenge through arbitration. Exelon argues that although challenging a revocation is commonplace, challenging the adoption of an SAE's recommendations is not and was never contemplated as a proper subject of arbitration. But this argument presents a distinction without a difference. As noted above, the arbitration clause in this CBA is quite broad. As such, the Court applies a presumption of arbitrability, which may be rebutted only by forceful evidence that the parties intended to exclude the particular type of dispute from arbitration. *See, e.g.*, *Exelon Gen. Co. v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 540 F.3d 640, 646 (7th Cir. 2008) (quoting *AT&T Techs.*, 475 U.S. at 650) ("Where the arbitration provision is broad, as it is here, only an 'express provision excluding a particular grievance from arbitration . . . [or] the most forceful evidence of a purpose to exclude the claim from

15

arbitration' can keep the claim from arbitration."). The CBA does not limit arbitration to disputes about revocation of unescorted access. Instead, it provides that the parties shall arbitrate all disputes about working conditions, and it broadly defines working conditions as "those elements concerned with the hours when an employee is at work and the acts required of the employee during such hours." Maintenance of unescorted access, and new conditions on keeping it, are working conditions. This is true regardless whether the company has already revoked it or threatens to do so if an employee fails to meet certain requirements.

Exelon argues that this construction is problematic because it asks an arbitrator to consider external law (which an arbitrator is not empowered to do) when determining whether Exelon had just cause to implement SAE recommendations pursuant to mandatory federal regulation. In response, Local 15 cites *International Brotherhood of Electrical Workers Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592 (7th Cir. 2014), in which an employee lost his unescorted access when he was deemed to have violated a company's FFD policy. The employee in *NextEra* was subsequently discharged, whereupon he filed a grievance claiming that he was "discharged from employment without just cause due to an inappropriate site access denial determination." *Id.* at 593. The company claimed it should not be required to arbitrate because the parties' CBA did not expressly designate disputes about unescorted access decisions as arbitrable. *Id.* at 596. The Seventh Circuit held that on its face, the CBA committed disputes over discharge to arbitration, so the dispute giving rise to the suit belonged in arbitration. *Id.* The court stated:

> We note, however, that we do *not* hold that the arbitrator may, in fact, review and overturn NextEra's revocation of [the employee's] unescorted

16

> access privileges. We express no opinion on the subject. NextEra is
> entitled to present its arguments on that issue to the arbitrator, and the
> arbitrator may well find the decision unreviewable. If so, the entire matter
> of the propriety of the discharge might be very quickly resolved. But the
> potential weakness of the Union's claim on the merits is no defense to the
> arbitrability of this dispute, as a threshold question.

*Id.* (emphasis in original).

Exelon is right to point out that *NextEra* did not concern whether NRC regulations rendered unreviewable decisions to revoke (or impose conditions on) unescorted access, but rather whether the arbitration provision that committed discharge disputes to arbitration committed disputes about revocation of unescorted access to arbitration as well. *But see Int'l Bhd. of Elec. Workers Sys. Council U-4 v. Florida Power & Light*, 580 F. App'x 868, 869 (11th Cir. 2014) (citing *NextEra* for the contention that the district court should "consider only whether the collective bargaining agreement provides the arbitrator with authority to adjudicate this dispute, not issues that go to the merits, *such as whether the NRC regulations render [the employer's] actions unreviewable*" (emphasis added)). But *NextEra* does reiterate the well known rule that where a dispute is committed to arbitration, a court should not resolve the question of arbitrability by making judgments as to whether the party seeking arbitration will or should win the arbitration. Local 15's grievances do not require an arbitrator to consider whether Exelon's FFD program complies with federal regulations, nor do they require an arbitrator to make an unqualified fitness-for-duty determination regarding the grieving employees. The grievances instead ask whether the company had just cause to act as it did in restricting the employees' access to the company's plants, which is what the Seventh Circuit has held is arbitrable under a sufficiently broad arbitration agreement like this one. *See Exelon 3*, 676 F.3d at 575; *NextEra*, 762 F.3d at 598. No

17

consideration of external law is necessary to make this determination.

Exelon also contends that submitting this issue to arbitration will put it in the impossible position of having to violate federal law in order to comply with an arbitration award. As Local 15 argues, however, it is premature and speculative to seek declaratory judgment to avoid that possible outcome when it is also entirely possible that an arbitral award might not force Exelon to violate NRC regulations at all. If an arbitrator determines Exelon had just cause to adopt the SAE's recommendation and impose the abstinence conditions, Exelon will not be ordered to take any action that contravenes federal law. And if an arbitrator finds Exelon's decision unsupported by just cause, the arbitrator might order Exelon to give the SAE more information and direct the SAE to reconsider her recommendation, an arbitral award that would be perfectly acceptable under the applicable NRC regulation. *See* 10 C.F.R. § 26.189(d) ("After the initial determination of fitness has been made, the professional may modify his or her evaluation and recommendations based on new or additional information from other sources including, but not limited to, the subject individual, another licensee or entity, or staff of an education or treatment program."). More importantly, even if the result of arbitration is an award that Exelon thinks is violative of federal regulations, it will have a way out: it can revive its suit and ask the Court to vacate the arbitration award as contrary to public policy. *See Titan Tire Corp. of Freeport, Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 734 F.3d 708, 716–17 (7th Cir. 2013) ("A violation of a statute or some other positive law is the clearest example of a violation of public policy.").

Finally, Exelon points out that both *Exelon 1* and *Exelon 3* dealt with company

action taken in compliance with 10 C.F.R. § 73, which provides that all regulated entities must provide a means of independent review when employees are found to have violated the access authorization program. See 10 C.F.R. § 73.56(l). In contrast, this case concerns FFD determinations under 10 C.F.R. § 26. Section 26 has a similar provision for independent review when employees are found to have violated an FFD policy, see 10 C.F.R. § 26.39, but it also contains the limiting provision that forbids a party from seeking a second determination of fitness or seeking a determination from anyone other than the SAE herself, see 10 C.F.R. § 26.189. Exelon seems to argue that because section 26.189 contains a limitation on review that is unique to section 26, disputes over adverse employment action taken pursuant to regulations in section 26 are generally less amenable to arbitration than are disputes over adverse action taken pursuant to section 73. But it is a stretch to construe a regulation forbidding a second determination of fitness as forbidding or even limiting review of any company action arising out of an SAE's recommendation. Section 26.189 says that a party may not seek a determination of fitness from someone other than the authorized SAE or a second determination of fitness after one has already been completed. It says nothing about removing from arbitration disputes about working conditions that arise out of an SAE's recommendation.

## Conclusion

For the foregoing reasons, the Court grants Local 15's motion for summary judgment and to compel arbitration [dkt. no. 40] and denies Exelon's motion for summary judgment [dkt. no. 22]. In light of the Court's ruling on cross-motion for summary judgment, the Court denies as moot Local 15's motion for discovery. The

19

Clerk is instructed to enter judgment in favor of defendant and directing that the grievances that are the subject of the lawsuit are to be submitted to arbitration pursuant to the parties' collective bargaining agreement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 6, 2015